UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:_12/16/2016__

```
-------------------------------------------------------- X
UNITED STATES OF AMERICA,                         :
                                                  :                16-CR-214 (VEC)
           -against-                              :
                                                  :                MEMORANDUM
CHRISTINE BODOUVA,                                :                OPINION AND ORDER
                                                  :
                               Defendant.         :
-------------------------------------------------------- X
```

VALERIE CAPRONI, United States District Judge:

Defendant Christine Bodouva was convicted by a jury of one count of theft of funds from an employee pension benefit fund in violation of 18 U.S.C. § 664. On November 10, 2016, the Court sentenced Bodouva to a term of incarceration of 366 days, a fine of $5,000, and forfeiture of $127,854.22. Dkts. 90, 91. Before the Court is Bodouva's motion for bail pending appeal and a stay of the Court's forfeiture order. Dkt. 97. Bodouva contends that the Court erred in precluding her from introducing evidence that she had repaid the embezzled funds three years after the misappropriation (and after she had been charged) and precluded her from introducing evidence as to the *source* of funds that had been invested by Bodouva and her father in their family business around the time of the charged embezzlement. Bodouva also argues that her appeal will raise substantial issues regarding her sentence because, she asserts, the Court impermissibly penalized her for going to trial and relied on inaccurate information in formulating a sentence.

Bodouva has not met her burden of demonstrating that there is a "substantial question" that is likely to result in a reversal or a new trial. 18 U.S.C. § 3143(b)(1)(B). Accordingly, and for the reasons that follow, Bodouva's motion for bail pending appeal and to stay the Court's forfeiture order is DENIED.

## DISCUSSION

**1.    Background**

Until 2013, Bodouva was the Chief Operating Officer of an architectural design firm founded by her father, William N. Bodouva & Associates (the "Company").  (PSR ¶¶ 10-11.) Bodouva was convicted of embezzling approximately $125,000 in 401(k) contributions that were withheld from her employees' paychecks but were not deposited into the Company's 401(k) plan (the "Fund").  (PSR ¶ 14.)  The evidence of her guilt was overwhelming.

The Defendant's authority over the Fund and her obligation to make remittances to the Fund was established through the testimony of the Company's bookkeeper, Nancie Brown.  (Tr. at 349-351.)  The Fund's Trust Agreement identified Bodouva as a trustee of the Fund, PSR ¶ 11, and Brown testified that Bodouva had authority to approve remittances to the Fund.  (Tr. (Brown) at 351.)  Brown testified that Bodouva regularly approved payments from the Company's accounts but during the period charged, refused to approve remitting employees' 401(k) contributions to the Fund.    (Tr. (Brown) at 350-51.)    The Government established that Bodouva used the misappropriated monies for personal purposes by tracing money from the Company's accounts to payment of Bodouva's personal credit cards, golf club memberships for her and members of her family, her parents' vacation homes in St. Maarten and Vermont, and her father's membership in a yacht club.  (PSR ¶ 19; GX-602, -605, -701-04; *see also* Tr. (Brown) at 365-68.)

The Government also presented testimony from a representative of the Department of Labor and the Fund's third party administrator (the "Administrator").  The Administrator testified that he sent Bodouva at least ten letters between 2012 and 2013 warning her that failure to make required remittances to the Fund violated ERISA rules and regulations.  (PSR ¶ 17; *see also* GX-505; Tr. (McCormack) at 185.)  August Huelle, a Department of Labor benefits advisor, testified

that he also contacted Bodouva repeatedly in 2013 after a relative of one of her employees complained to the Department that 401(k) funds were missing.  (Tr. (Huelle) at 455-57; GX-103.) Communications from the Administrator and Department showed that Bodouva had failed to remit funds at least twice before, in 2004 and 2007, and had been warned on both occasions by the Department or the Administrator that failing to make required contributions to the Fund was against the law.  (GX-303, -304, -509, -510.)

Finally, three of the Defendant's employees also testified.  They testified that they were unaware at the time that the Company was not making required contributions to the Fund and that Bodouva did so without their permission.  They also described confronting Bodouva in 2013 when they learned that the contributions had not been made.  (Tr. (Blaser) at 46-47; Tr. (Ashton) at 239-41; Tr. (De La Cruz) at 427-28, 432.)

On November 10, 2016, the Court sentenced Bodouva to one year and one day of incarceration, a fine, and forfeiture of approximately $125,000.  Dkts. 90, 91.  Based on an offense level of 16 and a criminal history category I, Bodouva's guidelines range was calculated to be 21 to 27 months' imprisonment.  PSR ¶¶ 36, 39, 77.  Thus, the sentence imposed was a downward variance from the guidelines range of approximately 50%.

Bodouva filed a timely notice of appeal and moved for bail pending appeal.  Dkt. 97.

**2.    Bail Pending Appeal is Not Appropriate in This Case**

A convicted defendant who has been sentenced to imprisonment must be detained unless the Court finds "by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community if released" and "that the appeal is not for the purpose of delay and raises a substantial question of law or fact likely to result in [. . .] reversal [or] . . . an order for a new trial."  18 U.S.C. § 3143(b)(1).  It is the defendant's burden to

rebut the presumption in favor of detention by clear and convincing evidence.  *See United States v. Abuhamra*, 389 F.3d 309, 319 (2d Cir. 2004) (post-verdict, pre-sentencing context).   If a defendant meets this substantial burden, bail pending appeal is required.  For the reasons stated in Bodouva's motion, the Court finds by clear and convincing evidence that she is unlikely to flee or pose a danger to the community.  Def.'s Mem. 2-3.  The Court also finds that delay is not the purpose of the appeal.  Accordingly, the only question is whether the appeal raises "a substantial question of law or fact likely to result in a reversal or order for a new trial."

The requirement that the appeal raise a substantial question of law or fact likely to result in a reversal or order for a new trial does not mean that the district court must "'predict the probability of reversal.'"  *United States v. Randell*, 761 F.2d 122, 124 (2d Cir. 1985) (quoting *United States v. Miller*, 753 F.2d 19, 23 (3d Cir. 1985)).  Instead, the requirement goes to the significance of the issue to the ultimate disposition of the appeal.  *Id.*  To determine whether this requirement is satisfied, a court must first determine whether the question on appeal is "substantial."  *Id.* at 125.  A substantial question "'is a close question or one that very well could be decided the other way.'"  *Id.* (quoting *United States v. Giancola*, 754 F.2d 898, 901 (11th Cir. 1985) (internal quotation marks omitted)).  If the question is substantial, a court "must then consider whether that question is 'so integral to the merits of the conviction on which defendant is to be imprisoned that a contrary appellate holding is likely to require reversal of the conviction or a new trial.'"  *Id.* (quoting *Miller,* 753 F.2d at 23).  Put differently, the appeal must raise a substantial question that, if decided in defendant's favor, will likely result in a reversal or order for a new trial as to all counts for which a defendant has been sentenced to prison.  *Id.* at 126.

A.        **Bodouva's Evidentiary Objections are Meritless**

Bodouva's motion for bail pending appeal asserts that the Court made two erroneous evidentiary rulings.  The Court granted the Government's motion *in limine* to preclude Bodouva from introducing evidence that she had repaid the embezzled funds in April 2016.  Dkt. 49 ("*Limine* Op.") at 3.  The Court also granted the Government's motion *in limine* to preclude Bodouva from introducing evidence as to the source of personal loans to the Company made by Bodouva and her father during the offense period.  *Id.* at 2-3.  The Court permitted the defense to introduce the fact of the loans, including that they were made by the Bodouvas.  Neither of the alleged evidentiary errors raises a "substantial question," and, assuming that one or both did present a substantial question, neither error would be grounds for reversal or a new trial.

A defendant's intent to repay embezzled funds is generally not a defense to prosecution for embezzlement.  *United States v. Buckley*, 101 F.3d 685, 1996 WL 282140 (table), at *2 (2d Cir. May 29, 1996) (citing *United States v. Young*, 955 F.2d 99, 104 (1st Cir. 1992)).  In narrow circumstances, a defendant's *contemporaneous* intent to repay embezzled funds is potentially relevant to whether the defendant had the requisite criminal intent at the time of the offense, to the extent it supports what is known as the "good faith" defense.  The "good faith" defense requires the Government to show that the defendant "did not believe in good faith that the use [of] the Plan's funds . . . benefitted or would benefit the Plan participants . . .; or [] that defendant did not believe in good faith that his or its use of funds was authorized or would be authorized by the Plan's representatives."  *United States v. Nolan*, 136 F.3d 265, 270 (2d Cir. 1998).  Evidence of intent to repay is potentially relevant to this defense because it may support the Defendant's argument that the use of the funds was beneficial to plan participants or, depending on the facts, authorized by the Plan's representatives.  *See United States v. Hoey*, No. 15-CR-229 (PAE), Dkt.

60 (S.D.N.Y. Mar. 1, 2016) (evidence of contemporaneous intent to repay may be relevant to good faith defense).[1]  But the fact that Bodouva finally remitted the money to the Fund—approximately three years *after* it had been wrongfully converted to her own use and *after* the end of the offense conduct as charged in the indictment and *after* the business had closed its doors and *after* the criminal complaint had been filed against her—is simply not probative as to her intent at the time of the offense.  That conclusion is even more obvious in light of the fact that Bodouva conceded that she was not raising a good faith defense under *Nolan*.  (Tr. at 590 (quoted *supra* n.1).)

The cases cited by Bodouva to support her argument that her eventual repayment of the funds is relevant are inapposite.  Several of the cases address distinguishable fact patterns involving loans or extensions of credit that were alleged to be fraudulent because the borrower did not intend to repay the money.  In *United States v. Cleary*, for example, a banker accused of approving fraudulent loans argued that he believed, at the time of the loan, that the loans would be repaid.  565 F.2d 43, 47-48 (2d Cir. 1977).  The nature of the defendant's scheme was such that he could be convicted of embezzlement only if the loan was illegitimate because he knew that it would not be repaid.  *Id.* at 47.  In that scenario the fact that the funds were repaid was obviously relevant to the defendant's defense.  Similarly, in *United States v. Foshee*, the defendant was charged with check-kiting, and the Fifth Circuit found that the defendant might have a defense if he could show that he had a reasonable expectation that the checks would be paid.  578 F.2d 629, 631-32 (5th Cir. 1978); *see also United States v. Dowlen*, 514 F. App'x 559, 565 (6th Cir. 2013)

---

[1]       As discussed further below, Bodouva did not raise the "good faith" defense to embezzlement.  Nor did she argue that her intent to repay at the time the money was taken negatived her criminal intent.  (*See* Tr. at 590:8-16 ([MR. GROVER]:  "Not good faith in the *Nolan* sense.  I'm not even—I'll let you know in advance, I don't think the *Nolan* charge, which your Honor bracketed on the proposed charge—applies to these facts.  [THE COURT]:  I don't think it does, either, but I wanted it in there just in case.  [MR. GROVER]:  No. I think your Honor picked that up very early, and I appreciate that because it actually assisted us."); Tr. (defense summation) at 895:5-11 ([MR. GROVER]:  "You're [the jury] going to hear that it really doesn't matter if you get it back if you stole the money in the first place. It doesn't matter.  You're also going to hear that, as we heard, promises I'm going to pay you back, that doesn't work, either.  We accept that.").

(repayment relevant in check-kiting prosecution to show intent at the time defendant wrote bad checks). Without belaboring the point, Bodouva relies on cases that involve causes of action with different elements, *United States v. Tidwell*, 559 F.2d 262, 266 (5th Cir. 1977) (bank fraud under 18 U.S.C. § 656); *United States v. Am. Grain & Related Indus.*, 763 F.2d 312, 320 (8th Cir. 1985) (common law conversion), or dicta, *United States v. Wiseman*, 274 F.3d 1235, 1241 (9th Cir. 2001). Bodouva has cited no case, and the Court is aware of none, that contravene the settled law on which this court based its ruling that repayment of embezzled funds is not relevant to a garden-variety embezzlement charge. *See United States v. Van Elsen*, 652 F.3d 955, 961-62 (8th Cir. 2011); *cf. United States v. Sirang*, 70 F.3d 588, 595 (11th Cir. 1995); *United States v. Cauble*, 706 F.2d 1322, 1354 (5th Cir. 1983).

The source of the money that the Bodouvas lent to the Company was also of limited relevance, and its limited relevance was plainly outweighed by its likely unfair prejudicial impact. Fed. R. Evid. 403. The loans themselves were relevant only to the extent that they allowed the defense to argue that Bodouva mistakenly believed that she was authorized to use the money in the Company's operating accounts because it had been lent to the Company rather than being earned by the Company. (*Limine* Op. at 3; *see also* Tr. (*limine* hearing (Dkt. 54)) at 57:18-23 ([THE COURT]: "What I'm hearing [Counsel] argue is that it's not that they were mistakenly dipping into [the] 401(k). It's almost like they didn't think there was any 401(k) because they didn't have enough money to make payroll. Is that it? [MR. GROVER]: That's correct.").) Whether the money that was lent to the Company came from a mortgage on her father's home or an insurance settlement related to Hurricane Sandy—as it did here—is entirely irrelevant to whether Bodouva mistakenly believed that the money she was spending rather than remitting to the Fund belonged to her and her family. On the other hand, the risk of prejudice to the

Government of painting a sympathetic portrait of the Defendant and her family was substantial and outweighed any probative value of the evidence.

The only case Bodouva cites to support her argument that this evidence was relevant, *United States v. Todd*, 108 F.3d 1329 (11th Cir. 1997), concerns evidence admitted to prove the good faith defense recognized by the Second Circuit in *Nolan*, 136 F.3d at 270, and called the "consent" defense by the Eleventh Circuit, *Todd*, 108 F.3d at 1333. *Todd* addresses what evidence the defendant may introduce to support the argument that the defendant acted in good faith and to rebut the Government's argument that he was motivated by greed, rather than an intent to benefit the plan participants or a mistaken belief that his conduct was authorized by the plan participants. *Todd*, 108 F.3d at 1334 ("We believe the evidence should have been admitted in order to allow Todd to argue that the employees could have authorized the use of Plan's funds. The jury might have concluded that the employees would have and did agree to the use of any and all funds to keep the company operating."). But that is not this case. The Defense specifically disclaimed reliance on the "good faith" defense. (Tr. at 590:3-11 ([COUNSEL]: "I don't think the *Nolan* charge . . . applies to these facts.").) While the Defense asserts that this evidence was necessary to rebut the mistaken impression caused by the Government's evidence relating to the use of the embezzled funds, that evidence was introduced to show that the funds were converted for the Defendant's use or the use of another, which is a required element of the offense.[2]

Even if the Court assumes that Bodouva has demonstrated a "substantial question" with respect to one or both of the complained of evidentiary rulings, Bodouva has not shown that if the

---

[2]  To the extent the defense complains that the Government was allowed to put in evidence that the Bodouvas were affluent (*e.g.*, golf club memberships, a ski house in Vermont, a house in the Caribbean, and a yacht club) while the defense was not allowed to put in evidence that their lifestyle was financed by loans against Mr. Bodouva's home, that dichotomy was of the defense's own making. The Court proposed that the parties stipulate that checks were written from the Operating Account for personal expenses as a way to avoid the evidence showing precisely how the funds were actually used but the defense declined. (*See* Tr. (*limine* hearing) at 62-64.)

Court of Appeals finds that one or both of the evidentiary rulings were erroneous that it would order a new trial as a result.  To determine whether an issue is so substantial that it is likely to require reversal of the conviction or a new trial, the Court considers whether the error was harmless in light of, *inter alia*, the importance of the evidence to the defense's theory, whether the excluded evidence was cumulative, other evidence supporting the excluded evidence, and the overall strength of the Government's case.  *See Brinson v. Walker*, 547 F.3d 387, 395 (2d Cir. 2008) (adopting *Van Arsdall* factors for harmless error analysis); *see also Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 150 (2d Cir. 1997) (evidentiary rulings are subject to harmless error review).

There is no question that even if the two rulings complained of were error, which the Court doubts, the error was harmless.  As discussed *supra* the Government's evidence in this case was overwhelming.  The Government introduced: testimony from the Department of Labor and Administrator that Bodouva had been previously warned that failing to remit Plan contributions was illegal (PSR ¶ 17; GX-303, -304, -505, -509, -510; Tr. (McCormack) at 185); testimony from the Company's bookkeeper that between 2012 and 2013 Bodouva told her not to remit the Fund contributions to the appropriate accounts while at the same time authorizing payments of Bodouva's personal expenses (Tr. (Brown) at 349-51, 365-68); evidence that Bodouva admitted to a Department of Labor representative that money that should have been remitted to the Fund was being used instead to pay business expenses of the Company (Tr. (Huelle) at 462-63); and records showing funds from the Company's operating account being used for Bodouva's personal expenses (PSR ¶ 19; GX-602, -605, -701-04; *see also* Tr. (Brown) at 365-68.)  The two evidentiary rulings that Bodouva complains about had only tangential relevance to any theory presented by the Defense at trial.  Bodouva did not argue the "good faith" defense to embezzlement, under which her intent to repay might be conceivably relevant—though even then the relevance of her

actual repayment is less obvious. The fact that Bodouva's father had lent money to the Company was mentioned repeatedly during the trial, (*see, e.g.*, Tr. (defense summation) at 898:6-9 ("So they started off the year putting money into the business. Putting money into the business, that is an intent to steal? Funding your business, that is an intent to steal? You've got to be kidding me[.]")), but there is no logical connection between the asset-specific source of the funds that were lent and Bodouva's defense that she believed she was entitled to make personal use of funds that had been withheld from her employees' salaries as 401(k) contributions.

In sum, Bodouva has not met her burden of showing that either claimed evidentiary error presents a "substantial question" or that either or both of those rulings, if found to have been error, would be grounds for reversal or a new trial. *Randell*, 761 F.2d at 125 (quoting *Miller*, 753 F.2d at 23).

**B.      Bodouva Has Not Identified Any Error At Sentencing**

Bodouva contends that errors in the Court's sentencing colloquy are likely to result in either a non-custodial sentence or a new sentence that is "less than the total of the time already served plus the expected duration of the appeal process." 18 U.S.C. § 3143(b)(1)(B)(IV). She contends that the Court improperly penalized her for pleading not guilty and compared her to the wrong sample of offenders by disregarding statistical evidence showing that many, if not most, non-remittal cases result in a non-custodial sentence. Def.'s Mem. at 11-12 (summarizing evidence). She also argues that the Court's sentence violated due process because it was based on inaccurate information, including that offenders in low-level fraud cases often receive sentences of jail time and that Bodouva was warned or investigated by the Department of Labor and Administrator three times. *Id.* at 13-16.

Bodouva's argument that the Court improperly penalized her for pleading not guilty is simply wrong.  While the Court considered the statistical evidence submitted by the Defendant (which showed that approximately 50% of defendants convicted of violating 18 U.S.C. § 664 are sentenced to some jail time, Dkt. 83 at 34), the fact that her data did not distinguish between defendants who received credit for acceptance of responsibility under the Sentencing Guidelines and were rewarded by the sentencing court for pleading guilty and those who did not significantly reduces its probative value.  (Tr. (sentencing colloquy (Dkt. 95)) at 34:1-16 ("What isn't known is how many of the cases where the defendant received probation were cases which were based on a guilty plea, *where the defendant legitimately received some benefit for pleading guilty and acknowledging his or her guilt.*")  The data's value is also limited because it does not identify which defendants included in the sample had been civilly warned previously, a factor highly relevant to the Court's analysis of the needs of general deterrence in Bodouva's case.  *Id.*

Bodouva has also failed to show that any inaccurate information underpins her sentence. The Court's reference to sentences imposed on other offenders was to the Court's own experience sentencing defendants in low-level theft cases and their life situations as compared to Bodouva's:

> But what sets those cases apart, these credit card cases and low level bank embezzlement cases, is that virtually all of those cases, which virtually all result in incarceration, virtually all, all involve criminals who are poor and uneducated and who, although this is not an excuse, are either unemployed or marginally employed and need the money.  Here, I have a highly educated woman, who did not need the money, who stole from her own employees to fund a lifestyle of golf and yacht clubs that others can only imagine.

Tr. (sentencing colloquy) at 34:17-35:6.  The statistics regarding sentencing in larceny and embezzlement cases nationwide and across the Second Circuit introduced in the Defense's motion (and recycled in part from the Defense's sentencing submission, Dkt. 83 at 33) are irrelevant to the Court's point that a defendant with no financial need who steals from her less-well-off colleagues is particularly indefensible.  Def.'s Mem. at 15-16.

Finally, Bodouva has not identified any inaccuracies in the Court's understanding of the Department of Labor's and the Administrator's investigations.  The evidence at trial established that Bodouva was warned by the Department of Labor in 2004 and 2013 that failing to remit money to the Fund was illegal.  (GX-103, -303-04.)  On a third occasion, in 2007 or 2008, Bodouva was investigated by the Department of Labor and warned by the Administrator that failing to make required remittances was illegal.  (Tr. (McCormack) at 170-173; PSR ¶ 16.)  The Court's colloquy references these occurrences.  (*See* Tr. (sentencing colloquy) at 34:1-16 ("What is also not known is how many of those involve people who had twice been warned by the Department of Labor, *and by their own pension administrator*"), 35:15-16 ("you were told not once, not twice, but three times by DOL *and your own pension fund administrator* that you cannot fail to remit 401(k) funds") (emphasis added).)[3]

In short, the Court finds that Bodouva has not met her burden of showing that her below-Guidelines sentence was infected with error that presents a "substantial question" likely to result in a reduced sentence on appeal.

### 3.      Stay of the Court's Forfeiture Order is Denied

"[T]he Court may stay [an] order of forfeiture on terms appropriate to ensure that the property remains available pending appellate review."  Fed. R. Crim. P. 32.2(d).  Generally, Courts consider four factors in connection with a motion to stay a forfeiture order: (1) the likelihood of success on appeal, (2) whether the forfeited assets will depreciate, (3) the forfeited assets' "intrinsic value" to the defendants, and (4) the expense of maintaining the forfeited property.  *United States*

---

[3]      Defense counsel described three separate occurrences at sentencing as well:  "[MS. ORTIZ]:  You do it twice, you might get into trouble by DOL again, but the third time, you are probably going to end up with a felony."  (Tr. (sentencing colloquy) at 30:4-22.)

*v. Silver*, No. 15-CR-93 (VEC), 2016 WL 4472929, at *11 (S.D.N.Y. Aug. 25, 2016) (quoting *United States v. Young*, No. 12-CR-210, 2014 WL 1671507, at *2 (W.D.N.Y. Apr. 24, 2014)).

Bodouva has not demonstrated any likelihood of success on appeal.  Under settled Second Circuit law, because forfeiture and restitution serve different purposes, forfeiture is not impermissibly duplicative of restitution.  *See United States v. Torres*, 703 F.3d 194, 203-04 (2d Cir. 2012).  Forfeiture has a punitive purpose in addition to the remedial goals served by restitution. *Id.* at 203; *cf. Austin v. United States*, 509 U.S. 602, 610 (1993) ("It is commonly understood that civil proceedings may advance punitive as well as remedial goals").   The potential for both forfeiture and restitution based on the same theft is inherent in the statute, which refers to forfeiture of "proceeds," 18 U.S.C. § 981(a)(1)(C), rather than a more limited amount such as "gains."  *See Torres*, 703 F.3d at 198-99; *see also United States v. Peters*, 732 F.3d 93, 99-101 (2d Cir. 2013) (interpreting materially similar criminal forfeiture statute, 18 U.S.C. § 982, to apply to "gross receipts").  Bodouva's argument to the contrary is based primarily on dicta from another Second Circuit case, *United States v. Kalish*, 626 F.3d 165, 169-70 (2d Cir. 2010).  The *Kalish* dicta is inconsistent with the reasoning in *Peters* and *Torres*, which recognize that the mandatory forfeiture provision in this case applies to "proceeds" rather than "ill-gotten gains."  *Compare Torres*, 703 F.3d 198-99; *Peters*, 732 F.3d at 99-101, and *Kalish*, 626 F.3d at 170 ("it is at least arguable that any money returned to a victim has reduced the amount of '*ill-gotten*' *gains* remaining in the defendant's possession") (emphasis added).  Moreover, the cases cited in *Kalish* reject a similar argument to the one Bodouva makes here.  *See United States v. Emerson*, 128 F.3d 557, 567 (7th Cir. 1997) ("we find unpersuasive Emerson's unsupported assertion that the Government would receive a windfall through the payment of both restitution and forfeiture"); *United States v. Various Computers & Computer Equip.*, 82 F.3d 582, 588 (3d Cir. 1996) ("[P]aying restitution plus

forfeiture at worst forces the offender to disgorge a total amount equal to twice the value of the proceeds of the crime. Given the many tangible and intangible costs of criminal activity, this is in no way disproportionate to "'the harm inflicted upon government and society by the offense.'" (citations and alterations omitted)). Bodouva's motion to stay the Court's order of forfeiture pending her appeal is denied.[4]

**CONCLUSION**.

Bodouva's motion for bail pending appeal and to stay the Court's order of forfeiture is denied. The Clerk of Court is respectfully directed to close the open motion at docket entry 94.

**SO ORDERED.**

Date:  **December 16, 2016**
       **New York, New York**

                                        **VALERIE CAPRONI**
                                        **United States District Judge**

---

[4]      It should be noted that this case involved the forfeiture of cash, not unique property that might have intrinsic value to the Defendant. In the event the Second Circuit carves out an exception to its decisions in *Torres* and *Peters*, Bodouva can be made whole by the return of the cash forfeited.